Leonard GREENE and Joyce
Greene, Plaintiffs,

v.

UNITED STATES of America,
Defendant.

No. 91 Civ. 3177 (GLG).

United States District Court,
S.D. New York.

Nov. 24, 1992.

Orans, Elsen & Lupert, New York City (Sheldon H. Elsen, Melissa A. Cohen, of counsel), Gerald & Lawrence Blumberg, New York City (Richard A. Sporn, of counsel), for plaintiffs.

Otto G. Obermaier, U.S. Atty., S.D.N.Y. by Robert W. Sadowski, Asst. U.S. Atty., New York City, for defendant.

## OPINION

GOETTEL, District Judge.

This action arises out of a tax assessment made by the Internal Revenue Service on plaintiffs Leonard and Joyce Greene. The IRS determined that the plaintiffs were required to report as income the gain realized from the sale of certain commodity futures contracts that was donated to a private foundation run by plaintiffs.

## I. FACTUAL BACKGROUND

Plaintiffs Leonard and Joyce Greene,[1] residents of Westchester County, founded the Institute for Socioeconomic Studies in the early 1970s. The Institute is an exempt private operating foundation under 26 U.S.C. § 501(c)(3). In 1974, the IRS issued plaintiffs, who file their tax returns jointly, a Private Letter Ruling regarding the tax treatment of donations of futures contracts to a charitable organization. The Ruling held they would be entitled to a charitable contribution deduction equal to the value of the donated futures contracts and that no gain need be recognized when the charity sold them. Between 1974 and 1980, plaintiffs reported on the federal tax returns the charitable contributions made to the Institute for Greene's entire equity in the futures contracts.

In 1981, § 1256 of the Internal Revenue Code was amended to provide that all commodities futures contracts acquired and positions established after June 23, 1981 were to be marked to market at year end and the gains (or losses), regardless of how long they had been held, would be characterized as 60% long-term and 40% short-term capital gains (or losses). 26 U.S.C. § 1256. Section 170 of the Code does not permit a charitable donation deduction for the value of donated property which would have been short-term gain to the taxpayer if the taxpayer had sold the property.

Since only long-term gain was deemed to be deductible "capital gain property" under 26 U.S.C. § 170(b)(1)(C)(iv) and short-term gains were therefore non-deductible, plaintiffs donated only the long-term portion of the futures contracts, deemed by § 1256 to be 60% of gains, if any, realized from their sale.

In 1982, Greene entered into an agreement under which he donated the long-term capital gains of selected futures contracts from his personal accounts at Merrill Lynch and retained for himself the short-term capital gains. For the most part, the selected futures were sold the same day that the donation was made and the portions of the proceeds representing the long-term capital gains was transferred to an account maintained at Merrill Lynch by the Institute.

Greene chose the selected futures contracts according to the funding needs of the Institute and the existence of unrealized gains in them. The contracts were then transferred to a Special Account held with Merrill Lynch over which Greene had given power of attorney to two accountants, Harry Reiner and Ralph Spector, acting as trustees on behalf of the Institute.[2] As we noted above, the donated contracts

---

1. Leonard and Joyce Greene filed joint tax returns during the tax years in question and consequently are both plaintiffs in this action. However, since Leonard Greene appears to have been most active in the donation of the futures contracts to the Institute and in the Institute's affairs, we frequently refer to him individually throughout the course of this decision as Greene. This is not meant to indicate that the plaintiffs stand in different shoes in this action; they do not. It is only intended as a shorthand way of referring to plaintiffs using the name of the primary actor.

2. It appears from the record that Harry Reiner, the Institute's accountant, was the original trustee for the Institute until 1982 when he had a heart attack. He was succeeded as trustee for the Institute in 1982 by Ralph Spector.

were sold on the same day or shortly after the gift was made. The portion of the proceeds representing the long-term gain was transferred to the Institute's account at Merrill Lynch. The proceeds representing the short-term capital gain was transferred to Greene's personal account at Merrill Lynch. The aggregate fair market value of these futures contracts on their sale dates in 1982 totalled approximately $856,000. Applying the new tax laws on donations of futures contracts, $513,583 of the Greenes' sale was long-term gain and $342,388 was short-term gain.

The Internal Revenue Code limits charitable contribution deductions to 30% of a taxpayer's adjusted gross income. 26 U.S.C. § 170(b). For the Greenes, this meant that their charitable contribution deduction was limited to $345,184, an amount they claimed on their 1982 tax return. The remaining $168,398 they claimed as a potential carryforward and they paid the taxes on the $342,388 of short-term gain from the futures sales.

In September 1990, the IRS sent plaintiffs a Notice of Deficiency for 1982 for over $90,000 plus an additional $22,598 for substantial underpayments of tax. The IRS had determined that the full fair market value of the futures contracts sales was included in plaintiff's 1982 taxable income. The IRS also disallowed the deductions claimed by plaintiffs between 1983 and 1987. Plaintiffs paid the assessed deficiency and later filed a claim for a refund which was disallowed by the IRS. In May 1991, plaintiffs commenced the present action seeking a $249,012 refund plus interest from the date of payment.

Before the court today are the government's motion for summary judgment and the plaintiffs' cross-motion for summary judgment. The United States contends that the IRS correctly determined that the entire gain from the futures sales was taxable income for the Greenes and the transfer of a portion to the Institute was a taxable anticipatory assignment of income. Defendant argues that the 1974 private letter only applies to transactions in that year and the facts and law contemplated in that letter differ from the case at bar.

Plaintiffs obviously disagree. They argue that the 1974 letter approved the donations and their donations were made in reliance upon it. In addition, plaintiffs contend that the step transaction theory, which says that separate, interrelated transactions are treated as one for tax purposes, is irrelevant. They also maintain that no assignment of income occurred.

## II. DISCUSSION

To prevail on a motion for summary judgment, the moving party must demonstrate "that there is no genuine issue as to any material fact and that [it] is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). The court's function is not to resolve disputed issues of facts but solely to determine if such genuine issues of fact exist. All ambiguities must be resolved and all inferences drawn in favor of the party defending against the motion. *Rattner v. Netburn,* 930 F.2d 204, 209 (2d Cir.1991); *Eastway Construction Corp. v. City of New York,* 762 F.2d 243, 249 (2nd Cir.1985), *cert. denied,* 484 U.S. 918, 108 S.Ct. 269, 98 L.Ed.2d 226 (1987). At oral argument, the parties agreed that it is not the underlying evidentiary facts which are disputed so much as the conclusions to be drawn from them.

The deduction of charitable contributions is governed by § 170 of the Internal Revenue Code. The Code distinguishes between property that is donated to a charity in kind and property that is first sold by the donor and the proceeds are given to the charity. If the donation is property other than money, the amount of the contribution is deemed the fair market value of the property at the time of donation. *See* Treas. Reg. § 1.170A–1(c)(1). For capital gain property, the deduction is limited to 30% of the taxpayer's adjusted gross income. 26 U.S.C. § 170(b)(1)(C)(i). When such contribution is for the entire interest in the property, no gain is realized by the taxpayer donor when the property is subsequently sold by the charity.

When the property is sold by the taxpayer first and the proceeds then donated, the donor must recognize and pay tax on the gain, if any, realized on the sale. 26 U.S.C. § 61; Treas.Reg. § 1.61–6(a); *see also Blake v. Commissioner*, 697 F.2d 473, 480 (2d Cir.1982). In such cases, the deduction equals the amount of cash donated. 26 U.S.C. § 170(a).

A. Anticipatory Assignment Issue

The government argues that the donation represented an anticipatory assignment of income because Greene only donated an interest in a portion of the income realized on the sales of the futures contracts. Defendant argues that since Greene in effect earned the income, the fact that he then diverted a portion of it to the Institute does not shield him from tax liability. Defendant notes that Greene knew how much the Institute needed for its operations and chose to donate the particular futures contracts whose gains, if realized immediately, would meet those needs. The Institute, says the government, did not bear any risk in the commodities market but was simply the recipient of an assignment of the realized long-term gains, a donation of appreciated property that is the substantial equivalent of an assignment of a portion of realized income.

Plaintiffs argue that the assignment of income theory is inapplicable since no contract for the sale of the property existed before the donation was made. Thus, plaintiffs say, the donor's right to receive at least some of the proceeds had not matured to the point that the gain from the sale should be deemed the donor's income. Plaintiffs argue that Greene neither controlled the value of the donated interests nor retained any legal right to receive any matured unrealized gains their sale might produce.

■ When assessing the purported donation of appreciated property, "[a] gift of appreciated property does not result in income to the donor so long as he gives the property away absolutely and parts with title thereto before the property gives to income by way of a sale." *Humacid Co. v.*

*Commissioner*, 42 T.C. 894, 913 (1964). Where a taxpayer has rights to the proceeds of a donated property that have so matured or ripened that he has a right to the gain, he is taxable on those proceeds even though he purports to transfer the property to someone else. *Morgan Guaranty Trust Co. v. United States*, 218 Ct.Cl. 57, 585 F.2d 988, 994 (1978) (quoting *S.C. Johnson & Son, Inc. v. Commissioner*, 63 T.C. 778, 786 (1975)). In short, if a fixed right to income had matured at the time the transfer was made, the proceeds would be considered income to the taxpayer irrespective of the purported donation. *Morgan Guaranty*, 585 F.2d at 995. Applying the assignment of income doctrine must be done on a case-by-case basis. *Harrison v. Schaffner*, 312 U.S. 579, 61 S.Ct. 759, 85 L.Ed. 1055 (1941).

In this case, the question becomes whether Greene's interests in the short-term capital gains had matured to the point where one could say that he had a right to the gain. Greene was a member of the Board of Directors for the recipient Institute as well as its President. This fact alone does not require Greene's donation to be considered income to Greene. *See S.C. Johnson & Son, Inc. v. Commissioner*, 63 T.C. 778 (1975). However, one might infer that as both donor and President of the recipient charity Greene was in a position to insure that the futures would be sold immediately and that the short-term gains would be returned to him while taxes on the long-term gain were avoided through the contribution.

It is clear that Greene retained the right to any short-term capital gain that resulted from the sale of the futures contracts. The question is how certain was it that short-term gains would be realized after he transferred the selected contracts to the Special Account controlled by the Institute's trustees. There was a standing instruction to Merrill Lynch, the financial company that held the Special Account into which the donated contracts were transferred, from the trustees to immediately sell any futures contracts transferred (or

donated) into the Special Account by Greene.

Since the donations were comprised of futures contracts, that standing instruction was important given that the price of futures is apt to shift suddenly and dramatically. A policy of immediate sale is undoubtedly the best way to insure that the donated futures do not lose their market value during the interim between donation and sale.

■ Reasonable probability of gains existing from a property's sale is not enough alone to make a gift an anticipatory assignment of income. *S.C. Johnson & Son,* 63 T.C. at 785. Therefore, the fact that Greene could reasonably anticipate that the Institute's trustee would immediately sell the donated futures contracts to avoid any downward slide in their market price while insuring funds were available for the Institute's operations does not necessarily convert the donation into an anticipatory assignment of income.

The key question is whether Greene maintained a measure of control or influence over the Institute's actions so that he could effectively select which futures contracts to transfer to the Special Account knowing to a virtual certainty that they would be sold immediately upon transfer (which all were). If Greene held such control, the court might conclude that each donation by Greene carried with it not merely a reasonable probability that income would be derived from the gift but a virtual certainty of it. If realization of short-term gains was imminent and certain, the donation might appear more like an anticipatory assignment of income. *Morgan Guaranty,* 585 F.2d at 995.

As the United States Tax Court stated in *Peterson Irrevocable Trust #2 v. Commissioner,* 51 T.C.M. 1300 (1986), *aff'd,* 822 F.2d 1093 (8th Cir.1987):

Whether a taxpayer possesses a right to receive income or gain is, of course, a question of fact, each case turning on its own particular facts. The realities and substance of the events, rather than formalities and the technical possibility that the sale might be abandoned, must govern our determination of whether an anticipatory assignment of income occurred. The court must determine whether at the time the purported donations were made whether the sale was practically certain to be completed despite the remote and hypothetical possibility of abandonment. *Id.* (citations omitted).

In essence, the government contends that plaintiffs did not donate any futures contracts but simply gave the Institute cash in the form of 60% of the contracts sold. Plaintiffs respond that the IRS Private Letter Ruling which plaintiff attached to their tax returns every year after it issued permitted such donations even if Greene was the trustee empowered to sell the futures contracts.

The government counters that 26 U.S.C. § 1256, which altered the allowable deductions for futures contracts by marking them to market and designating 60% of any gains as long-term and 40% as short-term, was enacted in 1981, subsequent to the issuance of the private letter ruling by the IRS in 1974. In addition, the government decries the potential for abuse by donors of this sort of securities. However, the record contains absolutely no evidence of any abuse by plaintiffs.

■ The government is doubtless correct that private letter rulings only apply to the particular transaction in the specific year for which they are issued. *See* Treas.Reg. § 601.201(1)(6). We might also agree that the facts contemplated by the 1974 Private Letter Ruling differed from the form of plaintiffs' transactions in 1982. The Ruling provided:

you propose to donate to various charitable organizations copper commodity futures contracts, which you purchased in 1973 ... Your proposed assignment of all your equitable interest in the copper futures contracts is evidenced by the sample agreement submitted with your request for ruling, between the Qualified Charity ("Charity") and you ... It is understood that as a result of the Agreement and irrevocable power of attorney your only interest in the copper futures

contracts assigned to the Charity will be bare legal title.

Exhibit C to Stipulation of Facts at 1. After 26 U.S.C. § 1256 changed the tax law in 1981 regarding the treatment of commodities futures contracts, Greene altered the structure of his gifts to the Institute, reducing his donation to only the long-term capital interest in the contracts. The Ruling was premised on Greene's donation of all his equitable interest and retention of only "bare legal title," a situation which factually no longer applied. Hence, the Ruling would seem to provide little support for plaintiffs' position after 1981.

However, plaintiffs argue with some equitable force that the government is equitably estopped from challenging their tax treatment of the donations of the futures contracts based upon the Private Letter Ruling issued in 1974. Although the Letter Ruling is effective only for the tax year in which it is issued, the change in the tax law after 1981 does not seem to directly impact on the issue of the anticipatory assignment of income.

Anticipatory assignments of income have always been treated as donations of cash instead of property even before the 1981 tax law marked futures contracts to market at 60% long-term gain, 40% short-term gain. *See, e.g., Helvering v. Horst*, 311 U.S. 112, 117–18, 61 S.Ct. 144, 147, 85 L.Ed. 75 (1940). The change does not appear to have altered the analysis of whether a donation would be considered a gift of property or an anticipatory assignment of income, except to the extent that a donor's retention of the short-term gains gave the transaction more the appearance of an income assignment.

Further, when the Letter Ruling was issued approving of the plaintiffs' donation of futures contracts, the IRS was no doubt aware that donations of futures contracts to a charity would be sold almost immediately to insure that the value of such volatile securities would be realized and thus useful to the recipient. Yet, the IRS gave its approval to such donations. Moreover, the IRS did not object to plaintiffs continued use of them as charitable deductions

for subsequent years until the 1982 tax year, all the while attaching copies of the original Letter Ruling to these tax returns. As explained above, however, we do not see how the new tax law directly affected the anticipatory income issue. However, given our conclusions concerning the issues of the anticipatory assignment of income and the step transactions, we need not resolve the equitable estoppel issue.

■ The crucial issue concerns Greene's control over the disposition of the futures contracts once they were transferred to the Merrill Lynch Special Account. If Greene retained a measure of influence over this standing instruction while wearing the hat of President and Board member of the Institute, one could argue that his control over the Institute gave him de facto control over their sale. From this one could conclude that: (1) realizing gains was a virtual certainty and (2) his donation could be viewed more as an anticipatory assignment of income.

The government at oral argument conjectured that Greene, as the Institute's President, must have retained control over the trustees. However, the evidence in the record suggests otherwise. At oral argument, plaintiffs represented to the court that the standing instruction did not originate with Greene. At his deposition, Greene did not recall having any conversations with the trustees regarding when the futures contracts should be sold. *See* Exhibit A to the Stipulation of Facts at 17–18, 22. Indeed, Greene stated that he did not know how long after he entered the agreements donating the futures contracts that they were sold nor was he apprised as to when they were sold. *Id.* at 30–31. As Greene answered at his deposition:

Q: Did you know that at the time the contracts were sold there would be a gain from that sale?

A: I don't know when the contracts were sold.

*Id.* at 36.

As we alluded to, the donation agreements between Greene and the Institute which included powers of attorney executed by Greene in favor of Ralph Spector, the

designated agent and trustee of the Institute. In particular, each donation agreement states:

> NOW, THEREFORE, Greene hereby transfers, assigns and conveys all of his right, title and interest in the long term capital gain of the futures contracts to ISES and hereby delivers an irrevocable power of attorney for the above designated contracts to Spector as Agent and Trustee for ISES giving him absolute and complete discretion to determine when and if to sell said contracts, assuming he desires to do so and further directs that the long term capital gain which would otherwise be paid to Greene shall be remitted directly to ISES.

>     \*    \*    \*    \*    \*    \*

> IT IS UNDERSTOOD AND AGREED that as a result of this agreement and the attached irrevocable power of attorney ... Greene will no longer have any control whatsoever in the above contracts.

Exhibit H to the Stipulation of Facts at 2. The plain meaning of this provision is unmistakable. It clearly indicates a donation of the contracts' long-term capital gain and the irrevocable delegation of control over the futures contracts to the Institute's trustee, Ralph Spector. Since the trustees of the Institute held total control over the contracts, we cannot say that Greene realized income from the long-term capital gains income from the futures contracts. Greene confirmed this at his deposition:

> Q: Did you have the power or authority to direct anyone to sell the futures contracts that were the subject of the donation to the Institute?
>
> A: No, I didn't.

Exhibit A to Stipulation of Facts at 35. This donation did not simply rest upon "skillfully devised" anticipatory arrangements that would cause us to view this an anticipatory assignment. *See Lucas v. Earl,* 281 U.S. 111, 114–15, 50 S.Ct. 241, 241, 74 L.Ed. 731 (1930).

Perhaps most convincingly, Mr. Hartnett, the Merrill Lynch account executive overseeing the Special Account, stated that the standing instruction was given to him by Harry Reiner, the original trustee for the Special Account, and continued by Ralph Spector, the second trustee authorized to act for the Institute. *See* Hartnett Affidavit at ¶ 5. According to Mr. Hartnett, "Leonard Greene never directed me to execute or not to execute a trade in the Special Account." *Id.*

While the question of Greene's control is a factual issue, the evidence in the record supports only one conclusion: Greene maintained no control over the sale of the donated futures contracts. Since plaintiffs have offered evidence directly supporting their position on this material issue of fact, defendant cannot rest on its pleadings but rather, to avoid summary judgment on this issue, must counter with evidentiary materials of its own. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 324–25, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). The fact that Greene was the Institute's President and a Board member alone is not sufficient. *See S.C. Johnson & Son,* 63 T.C. 778.

This case at bar is unlike the situation in *Kinsey v. Commissioner,* 477 F.2d 1058 (2d Cir.1973), cited by the government in its brief. In *Kinsey,* the stockholders of the donor company had already adopted a plan of liquidation before the gift of stock was made. *Id.* at 1059–60. As a result, the reality was that the liquidation of the gift stock was certain before the stock was donated to the recipient university.

Similar to the present case, the university's normal policy was to sell any stock it received as a gift. *Id.* at 1060. The court in *Kinsey* stressed that the circumstances nearly matched the facts of another case also cited by defendant, *Hudspeth v. United States,* 471 F.2d 275 (8th Cir.1972), in which a taxpayer made a gift to a charity after a plan of complete liquidation had been adopted and steps to carry it into effect had been taken. *See Kinsey,* 477 F.2d at 1061; *see also Jones v. United States,* 531 F.2d 1343 (6th Cir.1976) (finding under "realities and substance" test that a gift of stock to charities after a liquidation plan had been adopted by the company's directors and stockholders constituted an anticipatory assignment of income).

Similarly, cases cited by the government like *Salvatore v. Commissioner*, 434 F.2d 600 (2d Cir.1970), are unpersuasive. In *Salvatore*, the one-half interest in the gas station conveyed by the taxpayer, Mrs. Salvatore, to her children was only conveyed after a formal agreement of purchase and sale of the gas station was signed. While the court in *Salvatore* noted the brief duration of possession by her children, the court stressed that "Mrs. Salvatore, alone, rather than she and her children, was the seller of the gas station." *Id.* at 601.

Here, however, there is no evidence of any liquidation plan adopted by plaintiffs regarding sale of the contracts. Indeed, the only evidence bearing on this demonstrates that Greene neither planned, controlled, nor knew with certainty when the donated contracts would be sold. Unlike the company directors and stockholders in *Kinsey* or the parent in *Salvatore* who held the decision-making authority and approved the sales of the conveyed property, Greene executed powers of attorney that irrevocably removed such authority from his hands. No pre-transfer contracts of sale or formal liquidation plans existed. The sale decisions rested expressly and solely with the trustees. Under these circumstances, the donation of the contracts' long-term capital gain, while less tangible than many other forms of gifts, should still be considered a donation of property.

While the eventual, even immediate, sale of the contracts was implied by the nature of the property donated, the timing of the sale was controlled exclusively by the trustees. Viewing the entire record, the fact that the contracts were actually held for only a short period after their transfer to the Special Account is not alone determinative. On the present record, Greene's influence or control over the timing of sales of the futures contracts is simply an assumption, unsupported by any demonstrable evidence.

As a result, we conclude that defendant has failed to demonstrate that the factual issue of Greene's control over the sale of the donated futures contracts is in dispute. Because the only evidence in the record

bearing on this issue shows that Greene retained no control over the timing of the contracts' sales, his donations of their long-term gain should not properly be considered an anticipatory assignment of income. Consequently, we conclude that plaintiffs should not be taxed on the long-term gain donated to the Institute and therefore grant summary judgment for the plaintiff's on this issue.

### B. The Step Transaction Issue

■ Defendant alternatively argues that the transfers should be treated together with the later futures sales and division of proceeds as a single transaction. The government argues that Greene's plan was to meet the Institute's operating needs by selling selected futures contracts with unrealized appreciation of equal amounts. Rather than donating cash which would have placed a tax obligation on Greene for the entire gain, they argue that Greene tried to donate the futures contracts with a restriction that he would keep the short-term capital gain on their sale.

Plaintiffs claim that the crucial question is determining whether the step transaction theory applies is whether the property was donated with no strings attached or prearrangements made. They maintain that Greene donated all his interest in the long-term portions of the futures contracts to the Institute, free and clear.

As we mentioned earlier, the fact that a donor taxpayer controlled the foundation receiving the donation does not necessarily mean that the gift was a sham or that no real dominion over the property was donated. *See Palmer v. Commissioner*, 62 T.C. 684 (1974), *aff'd*, 523 F.2d 1308 (8th Cir. 1975). Plaintiffs point out that Ralph Spector and Harry Reiner acted as separate trustees for the Institute, held an irrevocable power of attorney, and had full discretion as to when to sell the contracts. Thus, plaintiffs stress, even if Greene expected the Institute to sell the contracts, he had no legal ability to compel their sale.

The question is how related were the decisions to sell the futures to their donation. If some prearrangement existed by

 

which plaintiffs donated selected contracts to cover the Institute's operating expenses and received back short term gains without having to pay taxes on the full amount of the contracts, one might view the transfers as simply a step transaction within the larger plan. The United States Tax Court has held that:

> [i]f, by means of restrictions on a gift to a charitable donee, either explicitly formulated or implied or understood, the donor so restricts the discretion of the donee that all that remains to be done is to carry out the donor's prearranged plan for disposition of the stock, the donor has effectively realized the gain inherent in the appreciated property.

*Blake v. Commissioner,* 42 T.C.M. 1336 (1981). Plaintiffs claim that their sale was not so much prearranged but rather simply the prudent act of a charity in need of operating capital.

Defendants argue that a standing instruction to Merrill Lynch existed directing that all futures transferred into the Special Account would be sold immediately. From this fact they argue that a reasonable inference can be drawn that a prearranged plan was in effect to use the charity to sell their futures, cover the foundation's needs with the long-term gains, and keep the short-term gains without having to pay taxes on the entire proceeds of the sale. Without such a plan, says defendant, the contracts could be sold at any time and no reasonable market value could be ascertained by Greene by which a deduction could be taken.

This case seems similar to the situation in *S.C. Johnson & Son,* 63 T.C. 778, in which the tax court held that donations of appreciated futures contracts to a charitable organization controlled by the taxpayer did not result in income to the taxpayer when the contracts were sold shortly after they had been donated. As we discussed above with the anticipatory assignment issue, the donation agreements and powers of attorney executed by Greene support plaintiff's position that the trustees held the reins over the sale of the futures con-

tracts once they were transferred into the Merrill Lynch Special Account.

We may speculate that Greene, as the Institute's President and primary patron, controlled those reins. However, the record contains no evidence that the standing instruction in fact derived from Greene. Indeed, the evidence indicates otherwise. The Merrill Lynch account executive in charge of the Special Account specifically stated the standing instruction was given by the trustees and he had no input on contract sales from Greene. There is simply no evidence to suggest that Greene was the source of the standing instruction. Hence, we must conclude on the record that the issue of Greene's control over the sale of the contracts was not such that the donations and sales could be viewed as step transactions encompassed within a unified plan. We therefore grant summary judgment for plaintiffs on this issue as well. The Clerk shall enter judgment for the plaintiffs in the amount of $249,012 refund plus interest from November 7, 1990, the date of plaintiffs' payment of the deficiency to the IRS.

SO ORDERED.