**Leonard GREENE and Joyce Greene, Plaintiffs,**

v.

**The UNITED STATES of America, Defendant.**

**No. 94 Civ. 0617 (GLG).**

United States District Court, S.D. New York.

Oct. 13, 1994.

Orans, Elsen & Lupert, New York City, Sheldon H. Elsen, of counsel Gerald & Lawrence Blumberg, New York City, Richard A. Sporn, of counsel, for plaintiffs.

Mary Jo White, U.S. Atty. for S.D. New York, New York City, Robert W. Sadowski, Asst. U.S. Atty., of counsel, for defendant.

## OPINION

GOETTEL, District Judge:

Plaintiffs Leonard and Joyce Greene are suing the United States for a refund of a total of approximately $2.8 million in taxes, interest and penalties assessed by the Internal Revenue Service ("IRS") in connection with their tax returns for the years 1984 through 1987. The parties have cross-moved for summary judgment.

## BACKGROUND

The pertinent facts of this case are not disputed. In the early 1970s, Leonard Greene founded the Institute for Socioeconomic Studies (the "Institute") and since then he has served as the Institute's president and as a director. The Institute is an exempt private operating foundation under 26 U.S.C. §§ 501(c)(3), 509(a) and 4942(j)(3).

In 1974, Greene received a private letter ruling ("the Ruling") from the IRS concerning the tax consequences of Greene's proposed plan to contribute futures contracts to the Institute. Greene's apparent reason for seeking the Ruling, as indicated in the Ruling itself, was that the New York Commodity Exchange, Inc. would not recognize the transfer of Greene's interest in the contracts to a third party.

The IRS ruled that Greene would be entitled to a charitable contribution deduction for the fair market value of the contracts and would not realize any gain or loss of personal income, provided (1) that Greene transferred all of his equitable rights and interests in the contracts to the Institute, retaining only bare legal title, (2) that Greene executed an irrevocable power of attorney granting the Institute complete power to determine when and if the contracts were to be sold, and (3) that the amounts that Greene would have received from the sales would be paid directly to the Institute.

At various times in 1974 through 1978 and in 1980, the Greenes made charitable contributions to the Institute of commodities futures contracts according to the terms of the Ruling. The IRS audited the Greenes' returns for one or more of those years, and

determined that no change was required in the returns.

The Economic Recovery Tax Act of 1981, Pub.L. No. 97–34, 95 Stat. 172 (1981) ("ERTA"), altered the tax landscape for donations of futures commodities. As amended, 26 U.S.C. § 1256 provided that gains or losses from any termination of a taxpayer's obligations or rights under such contracts would be treated as 60% long-term and 40% short-term capital gain or loss. This was a significant change, since § 170 of the Internal Revenue Code (the "Code") does not permit a charitable donation deduction for the value of donated property which would have been short-term gain to the taxpayer if the taxpayer had sold the property.

Accordingly, when Greene donated futures commodities contracts to the Institute between 1982 and 1987, he donated only the portion of the futures contracts that was characterized under § 1256 as long-term gain, while retaining for himself the short-term gain portion of the contracts. Each of these donations was made pursuant to an agreement between Greene and the trustee for the Institute, Ralph Spector.

Pursuant to these agreements, the futures contracts Greene wished to donate to the Institute were transferred from Greene's personal accounts at Merrill Lynch Pierce Fenner & Smith ("Merrill Lynch") into a Special Account at Merrill Lynch which was controlled by a trustee of the Institute. Each of the futures contracts so transferred was sold shortly thereafter pursuant to standing instructions given by the trustee for the Institute to Merrill Lynch. The portion of the proceeds from such sales representing long-term capital gains was transferred to an Institute account at Merrill Lynch, and the portion of such proceeds representing short-term capital gains was transferred to Greene's account at Merrill Lynch.

For each tax year from 1982 through 1987, the Greenes recognized, reported and paid income tax on an amount equal to the *short*-term capital gain realized upon the sale of the selected futures contracts. The Greenes did not recognize and report as income an amount equal to the *long*-term capital gains realized upon the sale of the selected futures contracts.

On September 6, 1990 the Commissioner of the IRS issued a Notice of Deficiency to the Greenes for the tax year 1982. The IRS determined that the Greenes were required to recognize and report as income an amount equal to the long-term capital gain portion of the commodities futures contracts they had donated to the Institute. The Greenes were allowed a charitable contribution deduction of cash in an amount equal to the long term capital gain realized on the sale of the selected futures contracts pursuant to 26 U.S.C. § 170. After paying the amount assessed by the IRS for the tax year 1982, the Greenes filed an action for refund of taxes, which action was assigned to this court.

In that case, the IRS based its position on two separate theories. *See Greene v. United States,* 806 F.Supp. 1165, 1168–73 (S.D.N.Y. 1992) (*"Greene I"*), *aff'd,* 13 F.3d 577 (2d Cir.1994). First, the IRS argued that under the anticipatory assignment of income theory, Greene's donation of a portion of the unrealized gains in certain futures contracts was in substance an assignment of a portion of realized income. *Id.* at 1168. We rejected this claim, as did the Second Circuit, on the grounds that Greene did not have a fixed right to income at the time the transfer was made, nor did he have control over the sale of the donated futures contracts. 13 F.3d at 581–83; 806 F.Supp. at 1168–72. We also rejected, as did the Second Circuit, the IRS's argument under the step transaction doctrine that Greene's donation of futures contracts and their subsequent sale by the Institute were merely separate steps in a single transaction. 13 F.3d at 583–85; 806 F.Supp. at 1172–73.

In March, 1992, the IRS issued to the Greenes a Notice of Deficiency for the tax years 1983 through 1987. As in the earlier Notice, the IRS determined that the Greenes were required to recognize and report as income an amount equal to the long-term capital gain portion of the donated commodities futures contracts. However, this time the IRS did not allow the Greenes any charitable contribution for the amounts donated, on the ground that the donations were non-

deductible partial interests. Once again, the Greenes paid the IRS in full and then commenced this lawsuit seeking a refund.

## ANALYSIS

To prevail on a motion for summary judgment, a party must demonstrate "that there is no genuine issue as to any material fact and that [it] is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The instant dispute is entirely over the interpretation of the relevant law—no factual disputes are involved.

The government has conceded the assignment of income and step transaction theories for purposes of this case, but has set forth two other theories in support of the IRS's action with respect to the tax years 1983 through 1987. First, the government argues that the Greenes donated only a partial interest in the commodities futures contracts, and thus are not entitled to a charitable deduction pursuant to 26 U.S.C. § 170. Second, the government argues that under 26 U.S.C. § 1256, as amended by ERTA, the Greenes were required to recognize as income the capital gains in the futures contracts when they donated them to the Institute.

### 1. Collateral Estoppel

Before reaching the government's arguments, we consider the Greenes' contention that they are entitled to summary judgment based on the doctrine of collateral estoppel. The general theory of collateral estoppel has been summed up by the Supreme Court thus: "Under collateral estoppel, once an issue is actually and necessarily determined by a court of competent jurisdiction, that determination is conclusive in subsequent suits based on a different cause of action involving a party to the prior litigation." Montana v. United States, 440 U.S. 147, 153, 99 S.Ct. 970, 973, 59 L.Ed.2d 210 (1979).

In Montana, also a tax case, the Supreme Court set out a three-part test for determining whether collateral estoppel applies: "first, whether the issues presented by [the second] litigation are in substance the same as those resolved [in the first]; second, whether controlling facts or legal principles have changed significantly since the [first]

judgment; and finally, whether other special circumstances warrant an exception to the normal rules of preclusion." Id. at 155, 99 S.Ct. at 975.

■ Plaintiffs argue that the issue of whether the Greenes donated only a partial interest in the futures contracts was decided in their favor by this court's opinion in Greene I. According to plaintiffs, one of the government's arguments in Greene I was that the Greenes had donated only a partial interest in the futures contracts, and thus should not be entitled to a charitable deduction. There is some support for this argument, since Section E, the last section of the government's Greene I brief, includes these words:

> Assuming arguendo, that Greene donated the long-term capital gain portion of the futures contracts, he contributed less than his entire interest in the futures contracts. Because he did not transfer this partial interest in trust, his entire claimed charitable contribution is not an allowable deduction. Therefore, the contribution as structured by Greene could not in any event result in an allowable charitable deduction under Section 170(a).

Memorandum of Law in Support of the Government's Motion for Summary Judgment at 27–28, Greene I (footnotes and citations omitted).

Plaintiffs argue that even though our decision in Greene I made no mention of the partial interest issue, this court implicitly decided the issue in plaintiffs' favor by entering judgment for plaintiffs. This court could not have entered judgment for plaintiffs, plaintiffs argue, if we had agreed with the government's partial interest theory. See Dennis v. Rhode Island Hosp. Trust Nat'l Bank, 744 F.2d 893, 898–99 (1st Cir.1984) ("An issue may be 'actually' decided even if it is not explicitly decided, for it may have constituted, logically or practically, a necessary component of the decision reached."), cited with approval in Wright, Miller & Cooper, Federal Practice and Procedure: Jurisdiction § 4420 n. 15.

The government denies having made the argument in Greene I that the Greenes had

donated only a partial interest in the futures contracts. We believe the government has characterized the situation in *Greene I* accurately.

First, as the government points out, the IRS did not disallow the Greenes' charitable deduction for the 1982 tax year, which was the only tax year at issue in *Greene I*. One would not ordinarily expect the government's lawyers to go beyond the determinations made by the government's tax experts by pressing a legal argument that would disallow any charitable deduction.

Second, the government's brief before this court in *Greene I* consistently argued that the Greenes donated only income, not property. In two of the sections preceding Section E of the brief, the government argued that what appeared to be a gift of property was in fact a donation of income, or cash proceeds. Section E can be read as another argument of this type. Under this interpretation, the government's argument is as follows:

1) if this were a gift of property, it would be a gift of a partial interest in property;
2) no charitable deduction is allowed for a gift of a partial interest in property;
3) since a charitable deduction was allowed, this must not have been a gift of property.

Unfortunately, the government did not include the last step of this argument in its brief. Understandably, plaintiffs interpreted this argument as an attempt to deny the Greenes a charitable deduction, and rebutted the argument in their reply brief. This court, however, read the argument as intended by the government.

Third, the very fact that absolutely no mention of the partial interest argument was made in this court's decision in *Greene I* confirms that we did not consider the government as having made such an argument. This court is not in the habit of issuing written opinions which omit any mention of an argument raised by the parties which is necessary to the judgment.

Fourth, the government made no mention of the partial interest issue in its appeal, which further suggests that it did not intend to raise this issue in *Greene I*.

Thus, we conclude that the issue of whether the Greenes donated only a partial interest in the futures contracts was not actually decided by our decision in *Greene I*. The government is not collaterally estopped from raising the issue in this action.

■ Plaintiffs also argue that the government is collaterally estopped from arguing that the marked-to-market provisions of the Code required the Greenes to recognize gain upon the donation of futures contracts to charity. According to plaintiffs, this is just another argument aimed at the issue that plaintiffs say was settled in *Greene I:* whether the Greenes had to recognize as income the long-term portion of the donated futures contracts. The government contends that it is raising a new issue, not merely a new argument.[1]

The question we must answer is "whether the issues presented by [the second] litigation are in substance the same as those resolved [in the first]." *Montana*, 440 U.S. at 155, 99 S.Ct. at 974. More specific guidance is provided by the Restatement (Second) of Judgments, which sets forth several relevant factors:

Is there a substantial overlap between the evidence or argument to be advanced in the second proceeding and that advanced in the first? Does the new evidence or argument involve application of the same rule of law as that involved in the prior proceeding? ... How closely related are the claims involved in the two proceedings?

Restatement, Second, Judgments § 27 (1982).

Guided by these principles, we find that the government's marked-to-market contentions represent a new issue which is not in substance the same as any of the issues resolved in *Greene I*. The previous litigation

---

1. Although the government did not raise the marked-to-market provisions before this court in *Greene I*, it did argue the provisions on appeal. The Second Circuit, in its discretion, refused to consider the government's new contention. *Greene*, 13 F.3d at 586. The Court alternately referred to the government's contention as an issue and an argument. *Id.*

was concerned with whether in substance the Greenes' donations represented a sale of commodities contracts, followed by a donation. The focus of that litigation was whether the Greenes had control over the disposition of the donated futures contracts, and what rights the Greenes had in the contracts. The resolution of those issues turned on court-created doctrines.

The issue the government now raises is whether under the marked-to-market provisions of § 1256 the Greenes' donations were a termination of their rights in the contracts, requiring them to recognize the resulting gain. This is analytically distinct from the issues in the previous litigation, and will turn on statutory interpretation. Thus, the doctrine of collateral estoppel does not bar the government from raising the § 1256 issue before this court.

### 2. Section 170(f)(3)

■ The Internal Revenue Code does not allow charitable deductions for donations of partial interests in property. Twenty–Six U.S.C. § 170(f)(3) provides:

(A) **In General.**—In the case of a contribution (not made by a transfer in trust) of an interest in property which consists of less than the taxpayer's entire interest in such property, a deduction shall be allowed under this section only to the extent that the value of the interest contributed would be allowable as a deduction under this section if such interest had been transferred in trust. For purposes of this subparagraph, a contribution by a taxpayer of the right to use property shall be treated as a contribution of less than the taxpayer's entire interest in such property.

(B) **Exceptions.**—Subparagraph (A) shall not apply to—

.    .    .    .    .

(ii) a contribution of an undivided portion of the taxpayer's entire interest in property....

According to the IRS' regulations, an undivided portion is "a fraction or percentage of each and every substantial interest or right

owned by the donor in such property." 26 C.F.R. § 1.170A–7(b)(1)(i).[2]

■ The government argues that when the Greenes donated commodities futures contracts to the Institute but retained a right to the 40% of the contracts representing short-term gain, they donated only a partial interest in the contracts and thus should not get a charitable deduction for any portion of the donation. The Greenes argue that the statutory exception in § 170(f)(3)(B)(ii) applies to their contributions to the Institute, since they maintain that they contributed an undivided portion of the futures contracts.

It is not immediately clear from the language of § 170(f)(3) whether the division of a futures contract into long-term and short-term capital gains portions pursuant to § 1256 creates separate "interests." We must consider the legislative history to gain a fuller understanding of the provision. Section 170(f)(3) was added to the Code in 1969. The legislative history indicates that Congress was concerned that taxpayers not receive a double benefit from donating to a charity the use of property for a limited period of time. See H.R.Rep. No. 413, 91st Cong., 1st Sess, 1969 WL 5895 (Leg.Hist.) at 117–18 (1969) U.S.Code Cong. & Admin.News 1969, 1645. The best way to illustrate this is with an example. If a taxpayer received $100,000 in annual rental income, and gave $10,000 to charity, she would get the charitable deduction and be taxed on $90,000 of income. But if a taxpayer donated 10% of her rental space for a year, thus receiving $90,000 in rental income, and also received a charitable deduction, she would be taxed on only $80,000. Since the economic realities of these two situations are identical (in both cases the taxpayer has $90,000 of post-donation income and the charity has received a donation worth $10,000), § 170(f)(3) made sure that the tax consequences of these two situations were also identical.

Interestingly, the language of § 170(f)(3)(A) is broader than what would be needed to accomplish the goal discussed in the legislative history. Section 170(f)(3)(A) sweepingly disallows a charitable deduction

---

**2.** The Greenes do not rely on the language in

§ 170(f)(3)(A) concerning transfers in trust.

for the donation of a partial interest in property, and defines the donation of the use of property as a particular application of this general rule. The language of the general rule seems to go beyond the purpose enunciated in the legislative history of not allowing taxpayers a double benefit. The general rule of § 170(f)(3)(A) seems to be that taxpayers cannot donate less than the full value of property while still taking a deduction for the full value. Administrative rulings applying § 170(f)(3)(A) have emphasized this general rule. *See* Rev.Rul. 81–282, 1981–2 C.B. 78 (contribution of voting stock to charitable organization with donor retaining right to vote that stock represents contribution of partial interest); Rev.Rul. 76–143, 1976–1 C.B. 63 (irrevocable assignment to college of cash surrender value of life insurance with donor retaining right to designate beneficiary and to assign balance of policy subject to college's right to cash surrender value is contribution of partial interest).

We will first consider whether the Greenes' deduction should be disallowed under the prevention of double benefit approach suggested by the legislative history, and then we will consider whether the Greenes have retained substantial rights in the donated property, in violation of the general rule suggested by the language of § 170(f)(3)(A).

The government argues that the Greenes received a double benefit from their charitable deductions because they avoided income tax on the long-term capital gain in their appreciated futures contracts and also claimed a charitable contribution deduction equal to the amount of the long-term capital gain. This does appear to be a double benefit of the type described in the legislative history of § 170(f)(3), since the Greenes received a deduction for the value of property on which they had not been taxed, and which they did not have to report as income. Nonetheless, taxpayers may generally donate an appreciated long-term asset to charity and obtain a deduction for the full value of the asset, without reporting the appreciation in value as income. *See Greene*, 13 F.3d at 584 (It is a "well-established rule that a gift of appreciated property does not result in in-

come to the donor.") (citing *Sheppard v. United States*, 361 F.2d 972, 977–78 (Ct.Cl. 1966) (per curiam) ("Congress, in an effort to encourage contributions to charitable organizations, has seen fit to permit a donor to deduct the full value of any gift of appreciated property without reporting as income from an exchange the appreciation in the value of the property which is thereby transferred.")).

It is clear from the legislative history of § 170(f)(3) that Congress intended the provision to disallow one kind of double benefit from charitable donations. However, the legislative history contains no indication that this aspect of § 170(f)(3) was intended to apply beyond the limited sphere of donations of the right to use property. A contrary interpretation of the legislative history would face the seemingly insurmountable task of explaining away the longstanding understanding that the Code *does* generally allow the kind of double benefit the Government is complaining about. In short, we find that the legislative history of § 170(f)(3) does not indicate that the Greenes should not be allowed a charitable deduction.

Next, we consider the government's argument from the general rule suggested by the language of § 170(f)(3). The Greenes argue that they transferred an undivided portion of the contracts to the Institute, namely the sixty percent representing long-term capital gains, without retaining any substantial rights in that portion of the contracts. The government counters that the tax aspects of the futures contracts represent important interests, and that a truly undivided portion of any futures contract would retain the 60–40 long-term gain versus short-term gain ratio of the whole contract.

In resolving this dispute, it is helpful to understand the nature of the 60–40 split in the characterization of capital gains in donated futures contracts. As described above, the 60–40 split was added to the Code by ERTA in 1981. The legislative history concerning the split is sparse. One commentator has quite reasonably suggested that "the 40/60 allocation between short-term and long-term capital gain or loss was purely arbitrary and merely part of a compromise between

the futures industry and the Treasury in determining the taxation of futures contracts." Mertens Law of Federal Income Taxation § 21A.04 n. 73 (1986).

Accordingly, we do not view the long-term and short-term capital gains portions as "substantial interest[s] or right[s] owned by the donor," 26 C.F.R. § 1.170A–7(b)(1)(i), that could not be divided in donating a portion of a futures contract. A statute apparently intended only to set a tax rate should not be extended to alter longstanding rules regarding deductions for charitable donations. The government has given us no evidence that the 60–40 split was intended to prevent taxpayers from engaging in the same types of charitable donations of futures contracts that were permissible before ERTA. Since it was legal before 1981 for the Greenes to choose to donate futures contracts representing long-term capital gains, without donating futures contracts representing short-term capital gains, it should be legal for the Greenes to donate only the long-term capital gains portion of futures contracts after 1981.

Moreover, the instant situation is distinguishable from the revenue rulings cited above where § 170(f)(3) was used to disallow charitable deductions, since the Greenes have not retained any interest in the portion of the futures contracts that they donated to the Institute.

In sum, we find that the Greenes donated an undivided portion of their entire interest in the futures contracts to the Institute in donating only the portion of the contracts representing long-term capital gain.

### 3. Section 1256

■ The government's other main argument is that the marked-to-market provisions of 26 U.S.C. § 1256 required the Greenes to realize as income their capital gains from their donations of futures contracts. Section 1256, which was also part of ERTA, provides in pertinent part:

(a) **General Rule.**—For purposes of this subtitle—

(1) each section 1256 contract [including regulated futures contracts] held by the taxpayer at the close of the taxable year shall be treated as sold for its fair market value on the last business day of such taxable year (and any gain or loss shall be taken into account for the taxable year),

(2) proper adjustment shall be made in the amount of any gain or loss subsequently realized for gain or loss taken into account by reason of paragraph (1),

.      .      .      .      .

(c) **Terminations, etc.**—

(1) **In general.**—The rules of paragraphs (1), (2), and (3) of subsection (a) shall also apply to the termination (or transfer) during the taxable year of the taxpayer's obligation (or rights) with respect to a section 1256 contract by offsetting, by taking or making delivery, by exercise or being exercised, by assignment or being assigned, by lapse, or otherwise.

The government contends that when the Greenes transferred their futures contracts to the Institute, and thus terminated their rights with regard to the long-term capital gain portion of those contracts, they were required by § 1256 to pay taxes on the difference between the fair market value of each futures contract on the date of the transfer and their basis in the futures contract.

Looking only at the language of § 1256, it is unclear whether the provision encompasses charitable donations. On the one hand, the language requiring marking-to-market upon "the termination (or transfer) . . . of the taxpayer's obligation (or rights) with respect to a section 1256 contract" is arguably broad enough to include contracts donated to a charity. On the other hand, the specific examples of terminations and transfers requiring marking-to-market—"by offsetting, by taking or making delivery, by exercise or being exercised, by assignment or being assigned, [or] by lapse"—describe economic activity that seems fundamentally different from charitable giving. Since the language of § 1256 is ambiguous as to whether it applies to charitable donations, we must examine the legislative history to discern Congress' intent. *See Blum v. Stenson,* 465 U.S. 886, 896, 104 S.Ct. 1541, 1548, 79 L.Ed.2d 891 (1984).

As with ERTA's 60–40 characterization of capital gains for futures contracts, ERTA's "marked-to-market" rules represented a novel approach to taxing futures contracts. Congress' intent, as evidenced by the legislative history quoted below, was to bring the taxation of futures contracts more in line with economic reality. The economic situation that motivated Congress to pass the "marked-to-market" rules has been described by one tax treatise as follows:

> All United States domestic futures trading exchanges employ a system known as "marked-to-market" accounting. Under "marked-to-market" accounting, each trader's equity or "cash" position in his futures contracts on an exchange is measured at the end of each trading day based on the net unrealized gain or loss on each open futures contract held by the taxpayer on such day (based on the exchange-posted settlement price for each contract on such day)....

> The real significance of marked-to-market accounting is that these changes to the taxpayer's equity position determine the taxpayer's margin requirements in the futures contract. If the price of a long position increases or the price of a short position decreases, the taxpayer's equity position under the marked-to-market system of accounting has increased and the taxpayer is allowed to withdraw funds from his margin account. On the other hand, if the price of a long position decreases and the price of a short position increases, the taxpayer's equity position has decreased and he may be required to put more funds into his capital account. Thus, the marked-to-market system of accounting treats paper profits and losses as economic profits and losses by requiring the futures trader to deposit cash or by allowing the trader to withdraw cash and adjust his cash position in the margin account.

Mertens Law of Federal Income Taxation § 21A.02 (1986).

In enacting § 1256, Congress took note of the fact that futures traders receive real economic gains and losses before they actually terminate their futures positions:

> The committee bill adopts a mark-to-market system for the taxation of commodity futures contracts. This rule applies the doctrine of constructive receipt to gains in a futures trading account at year-end. The application of this rule in present law means, for example, that taxpayers must include in their income any interest which has accrued during the year, even though they may not have withdrawn the interest from their savings accounts. Because a taxpayer who trades futures contracts receives profits as a matter of right or must pay losses in cash daily, the committee believes it appropriate to measure the taxpayer's futures' income on the same basis for tax purposes.

S.Rep. No. 144, 97th Cong., 1st Sess., 1981 WL 21359 (Leg.Hist.) at 306 (1981) U.S.Code Cong. & Admin.News 1981, 105, 256.

Section 1256 forces futures traders to take account of gains or losses at the end of each year, and upon any termination or transfer of the futures contracts, as defined in § 1256(c). The government argues that the integrity of the marked-to-market scheme requires that charitable donations of futures contracts be considered a termination or transfer that requires the donor to pay tax on unrealized gain. Boiled down, the government's position is that futures traders should not be able to avoid recognizing gain in futures contracts by donating them to charity. We do not see any other way in which the integrity of the marked-to-market scheme would be violated if charitable donations do not trigger the provisions of § 1256.[3]

3. The government contends that when a futures trader withdraws funds from his margin account representing the unrealized gain in the futures contract, that is not a taxable event. If such a trader subsequently gives the appreciated futures contracts to charity, and is not taxed on the donation, the taxpayer would avoid income tax on the amounts withdrawn from the margin account and could also claim the full value of the contract as a charitable deduction. This, the government contends, would be an abuse of the marked-to-market rules. It seems likely, however, that the value of the futures contract as a donation would be proportionately diminished if the trader had drawn against it in his margin account. Thus, our position is not swayed by this argument.

We find the government's arguments unpersuasive. Taxpayers are able to donate other types of property to charity without realizing capital gains as income. Nothing in the legislative history of § 1256 indicates that the marked-to-market rules were intended to alter the charitable deduction for the donation of futures contracts.

## CONCLUSION

The Greenes' motion for summary judgment is granted, and the government's motion for summary judgment is denied. However, this disposition does not entirely resolve this action. On September 26, 1994, we granted a motion by plaintiffs, which was unopposed by the government, to amend the complaint to add a refund claim for the 1983 tax year. According to plaintiffs' affidavit, the 1983 claim involves many of the same legal issues as have been resolved by this ruling. As to those issues, the affidavit states that the parties intend to stipulate that the instant ruling is dispositive. However, the affidavit also indicates that the 1983 claim involves additional legal issues, and thus the instant action remains open.

**SO ORDERED.**