Leonard GREENE and Joyce Greene,
Plaintiffs–Appellees,

v.

UNITED STATES of America,
Defendant–Appellant.

No. 95–6006.

United States Court of Appeals,
Second Circuit.

Argued Oct. 12, 1995.

Decided April 2, 1996.

Robert W. Sadowski, Assistant United States Attorney, New York City (Mary Jo White, United States Attorney, Kay K. Gardiner, Assistant United States Attorney, Southern District of New York, New York City, of counsel), for Defendant–Appellant.

**1350**

Sheldon H. Elsen, New York City (Melissa A. Cohen, Orans, Elsen & Lupert, New York City; Richard A. Sporn, Gerald & Lawrence Blumberg, New York City, of counsel), for Plaintiffs–Appellees.

Before NEWMAN, Chief Judge, CARDAMONE and CABRANES, Circuit Judges.

CARDAMONE, Circuit Judge:

■ This appeal in a tax case concerns those portions of the Internal Revenue Code that govern the tax treatment of regulated futures contracts. The personal income taxation system generally operates on a "cash basis," which means that it usually requires gains to be recognized—or losses to be claimed--when property is sold and money or property is received in exchange. *See* 26 U.S.C. § 1001 (1994). The cash basis accounting system applies to the sale of nearly all forms of property, including real estate and most securities. But for the taxation of regulated futures contracts, the subject of this appeal, Congress requires the use of a different accounting regime. This different regime—known as "accrual" accounting—requires taxpayers annually to "mark" their futures contracts to "market," making adjustments to income for accrued economic gain or loss. *See* 26 U.S.C. § 1256 (1994). The "mark-to-market" system determines taxable income by making reference to changes in the actual market value of a taxpayer's futures contracts even when the taxpayer has not yet sold or exchanged the contracts or otherwise realized a gain or a loss. *See* Thomas L. Evans, *The Evolution of Federal Income Tax Accounting—A Growing Trend Towards Mark–to–Market?*, 67 Taxes 824, 825 (1989).

The plaintiffs in the instant case assert that the Internal Revenue Code (IRC) does not require that futures contracts that are donated to charity be marked to market. The district court agreed, finding an exception to the mark-to-market system when charitable donations are involved, and granted summary judgment for the taxpayers on November 7, 1994.

## BACKGROUND

Because the relevant facts are not in dispute and have been fully discussed elsewhere, *see Greene v. United States (Greene I )*, 13 F.3d 577, 579–80 (2d Cir.1994); *Greene v. United States (Greene II )*, 864 F.Supp. 407, 409–10 (S.D.N.Y.1994), only those matters essential to the disposition of this appeal will be detailed.

Leonard and Joyce Greene (taxpayers) are a married couple. In the early 1970s, Mr. Greene founded the Institute for Socioeconomic Studies, Inc. (Institute), a non-profit, tax-exempt private foundation. Between 1974 and 1980 the Greenes donated futures contracts to the Institute in accordance with the terms of a private letter ruling from the Internal Revenue Service (IRS). The ruling allowed the Greenes to donate futures contracts and claim a charitable deduction without violating the IRC or the rules of the New York Commodity Exchange. *Greene I,* 13 F.3d at 579.

In 1981, after the addition of § 1256 to the IRC, the Greenes changed their method of giving to the Institute. Section 1256 required taxpayers to characterize the gains or losses on futures contracts as 60 percent long-term and 40 percent short-term capital gains or losses, regardless of how long the contracts had been held. 26 U.S.C. § 1256(a). Since the rules governing charitable donations permitted a charitable deduction only for property that would have provided the taxpayer with a long-term capital gain, *see* 26 U.S.C. § 170(e)(1)(A) (1994), the Greenes simply arranged to give the long-term capital gain portion of their futures contracts to the Institute, retaining the short-term capital gain portion of the contract. This method of charitable giving was used by the Greenes from 1982 until 1987. *Greene I,* 13 F.3d at 579–80.

In 1990 the IRS sent taxpayers a Notice of Deficiency for 1982, seeking to include the total change in the fair market value of the futures contracts in their 1982 taxable income. It also disallowed the Greenes' deductions, asserted to be carryforwards, from 1983 through 1987 for the excess over the maximum charitable deduction allowed in 1982. After paying the deficiency, taxpayers

filed a claim for refund with the IRS, which was disallowed. In May 1991 taxpayers filed suit in the United States District Court for the Southern District of New York. When the taxpayers moved for summary judgment, the district court ruled in their favor. *See Greene v. United States*, 806 F.Supp. 1165 (S.D.N.Y.1992).

The government appealed, making three arguments. First, it contended that the anticipatory assignment of income doctrine prevented the taxpayers from donating their futures contracts to the Institute without first paying income tax on the contracts. Second, it maintained that the step transaction doctrine should have been applied in order to treat the Greenes' donation as a sale followed by a gift of a portion of the sale proceeds. Third, it raised a new issue, alleging that 26 U.S.C. § 1256 required taxpayer recognition of the economic gain accrued with respect to a futures contract before it was transferred to the Institute. ·We rejected the government's first two arguments and "decline[d] the invitation to address" the third issue concerning § 1256. *Greene I*, 13 F.3d at 586. We held the Greenes were entitled to a refund for the 1982 tax year. *Id.*

Meanwhile, in March 1992, the IRS issued a Notice of Deficiency for the tax years 1983 through 1987. As before, the IRS ordered the Greenes to recognize and report as income an amount equal to the long-term capital gain portion of the donated futures contracts. The IRS also ordered payment of tax penalties under 26 U.S.C. §§ 6661, 6653, and 6621. And, as they had earlier, the Greenes paid the claimed deficiency and again filed for a refund. When this request was denied, the Greenes again brought suit in the Southern District of New York before Judge Goettel. *See Greene II*, 864 F.Supp. at 409-10.

The IRS advanced two arguments in opposition to the Greenes' suit. First, it denied the availability of a charitable deduction on the grounds that the Greenes had donated a partial interest in property. *See Greene II*, 864 F.Supp. at 410, 412-14, 26 U.S.C. § 170(f)(3) (1994) (generally precluding charitable deductions for donations of partial interests in property). Second, it declared that § 1256 required taxpayers to recognize as taxable income the long-term capital gain portion of the futures contracts donated to the Institute. Both parties moved for summary judgment, and the district court ruled for the taxpayers, declining to adopt either of the government's theories. *See Greene II*, 864 F.Supp. 407.

This appeal followed. The government has abandoned the first ground—that the Greenes' donation was of a partial interest in property under § 170—nor does it seek tax penalties pursuant to 26 U.S.C. §§ 6661, 6653, or 6621. Instead, the IRS raises only the second issue, that is, whether § 1256 requires recognition of a long-term capital gain when futures contracts are donated to charity. Hence, it is plain that whatever the outcome of this litigation, the Greenes will still be entitled to claim a charitable deduction. The question that we must answer is whether taxpayers must first recognize as income the long-term capital gains that accrued before the futures contracts were donated to the Institute.

## DISCUSSION

■ We review the district court's grant of summary judgment *de novo*, and where, as here, no genuine issues of material fact are in dispute, we need only decide whether the law was correctly applied by the trial court. *See Siskind v. Sperry Retirement Program*, 47 F.3d 498, 503 (2d Cir.1995).

### I Issue Preclusion

■ As a threshold matter the Greenes insist, as they did before the trial court, that the government is collaterally estopped from asserting any tax deficiency against them for the tax years 1983–1987. Because the facts in *Greene I* were substantially the same as the facts before us now, the Greenes continue, the tax treatment of their charitable donation of futures contracts was conclusively determined in *Greene I*. Consequently, they conclude, the government's attempt to litigate the 1983–1987 deficiencies under a different theory than the one it principally relied on in adjudicating the 1982 tax deficiency is barred by the doctrine of collateral estop-

pel. The district court rejected this contention. Reasoning that the government's § 1256 claim was "analytically distinct from the issues in the previous litigation," it ruled that the claim could be advanced in the instant litigation. *Greene II,* 864 F.Supp. at 412. We agree.

■ When a court is asked to reexamine an issue once determined, the competing values of finality or attaining a more just or more uniform result come into play. The doctrine of collateral estoppel, in making a choice among these competing values, chose repose. The doctrine therefore embodies the notion that litigation, like all things, must have an end. This doctrine, called issue preclusion in the Restatement (Second) of Judgments § 27 (1980), provides that "once an issue is actually and necessarily determined by a court of competent jurisdiction, that determination is conclusive in subsequent suits based on a different cause of action involving a party to the prior litigation." *Montana v. United States,* 440 U.S. 147, 153, 99 S.Ct. 970, 973, 59 L.Ed.2d 210 (1979).

■ Issue preclusion is a doctrine of repose that permits a court to decide conclusively a question properly before it. It bars, among other things, repeated litigation of identical legal questions by the same parties. This important policy serves both litigants and the judiciary. *See Montana,* 440 U.S. at 153–54, 99 S.Ct. at 973–74. Yet, the collateral estoppel doctrine, as we have recognized, is narrowly applied in tax cases. *See ITT Corp. v. United States,* 963 F.2d 561, 564 (2d Cir.1992).

The Supreme Court considered the doctrine in the context of tax litigation in *Montana.* It held that complete identity of issues need not exist to invoke collateral estoppel. Instead, a three-part test was established to guide courts in deciding whether a litigant is collaterally estopped from litigating a given issue. First, we must ascertain if "the issues presented by [the second] litigation are in substance the same as those resolved [in the first]." Second, we should examine "whether controlling facts or legal principles have changed significantly" since the initial decision. And, third, we look at the case carefully to consider if "other special circumstances warrant an exception to the normal rules of preclusion." *Montana,* 440 U.S. at 155, 99 S.Ct. at 975; *see also ITT Corp.,* 963 F.2d at 564.

Employing the Supreme Court's three-part test, we note initially with respect to step two that no controlling facts or legal principles have changed since the decision in *Greene I.* In addition, there are no special circumstances warranting an exception to preclusion. Hence, we turn to consider step one—whether *Greene I* presented substantially the same issue as that involved in the present case. While the government concededly raised the § 1256 question on appeal in *Greene I,* in the exercise of our discretion, we decided the case on other grounds, explaining:

> The government asks us to construe a 1981 statute. This task would require a thorough investigation of the legislative history of the statute, as well as the applicable case law. In its brief the government discusses the application of § 1256(c) in less than three pages, and at oral argument it did not mention the issue. No reason is offered by the government for the failure to raise it below, nor does it suggest that there will be any great injustice if we refuse to resolve it. Therefore, we decline the invitation to address this issue.

*Greene I,* 13 F.3d at 586.

In other words, we expressly refused to consider the government's § 1256 argument in *Greene I.* We have previously held that "if an appeal is taken and the appellate court affirms on one ground and disregards the other, there is not collateral estoppel as to the unreviewed ground." *Gelb v. Royal Globe Ins. Co.,* 798 F.2d 38, 45 (2d Cir.1986), *cert. denied,* 480 U.S. 948, 107 S.Ct. 1608, 94 L.Ed.2d 794 (1987). To intimate that a court's reasons for declining to discuss and resolve a given issue constitute an adjudication of that issue puts the doctrine of collateral estoppel at cross-purposes indeed. Therefore, our decision not to address or decide the § 1256 question in *Greene I* does not invoke the bar of collateral estoppel and

consideration of that question may now properly proceed. *See Liona Corp. v. PCH Assocs. (In Re PCH Assocs.),* 949 F.2d 585, 593 (2d Cir.1991) ("To hold that our intentional decision not to resolve this issue amounts to a final adjudication of the issue would be to misapply the settled law regarding issue preclusion.").

Further support for the view taken in the above decisional law is found in the Restatement (Second) of Judgments § 27 cmt. c (1980). The Restatement first acknowledges that determining the scope of an issue previously litigated is "[o]ne of the most difficult problems in the application" of issue preclusion. It then provides a series of questions to guide a court's inquiry when there is a lack of total identity between the matters presented, asking generally: whether there is a substantial overlap in the evidence or argument between the two proceedings; whether the same rule of law as that relied on in the prior proceeding is invoked in the second proceeding; and whether the claims in the two proceedings are closely related. *Id.*

Here, while the evidence involved in the two cases is essentially the same, the government's new argument involves application of entirely different rules than those involved in the initial litigation. The earlier litigation dealt with the anticipatory assignment of income doctrine and the step transaction doctrine. There was no discussion of the merits of the § 1256 question. This litigation, then, poses wholly distinct questions than those involved and decided in *Greene I.*

Moreover, one of our reasons for not addressing the § 1256 issue in *Greene I* is that we found there would be no "great injustice" in declining to do so. Clearly, our prior decision would be unjust if the government's failure to raise the issue in the context of the Greenes' 1982 tax year prevented the government from raising the issue in analyzing future tax years. After all, "[e]ach [tax] year is the origin of a new liability and of a separate cause of action." *Commissioner v. Sunnen,* 333 U.S. 591, 598, 68 S.Ct. 715, 719, 92 L.Ed. 898 (1948). It is for this reason that the doctrine of *res judicata* or *claim* preclusion does not bar the government from now raising the § 1256 issue, forcing the taxpayers to rely instead solely on *issue* preclusion.

In sum, once an issue is squarely presented, litigated, and resolved, the *Montana* test bars subsequent litigation. Relying on the guides set forth in *Montana,* we agree with the district court's ruling that because there was no preclusion of the § 1256 issue it could properly reach the merits of that statutory question. We now do the same.

## II Interpretation of § 1256

■ Our reading of 26 U.S.C. § 1256 must be guided by general principles of statutory interpretation. While it cannot be disputed that construction of statutes requires "some imagination of the purposes which lie behind them," *Lehigh Valley Coal Co. v. Yensavage,* 218 F. 547, 553 (2d Cir.1914) (L.Hand, J.), *cert. denied,* 235 U.S. 705, 35 S.Ct. 282, 59 L.Ed. 434 (1915), the statutory language remains of paramount importance. This is because "[w]hen we find the terms of a statute unambiguous, judicial inquiry is complete, except in 'rare and exceptional circumstances.'" *Rubin v. United States,* 449 U.S. 424, 430, 101 S.Ct. 698, 701, 66 L.Ed.2d 633 (1981). Thus, in construing § 1256 we look first to its plain language.

### A. *Statutory Language*

Section 1256—titled "Section 1256 contracts marked to market"—provides, in relevant part:

(a) **General Rule.**—For purposes of this subtitle—

(1) each section 1256 contract held by the taxpayer at the close of the taxable year shall be treated as sold for its fair market value on the last business day of such taxable year (and any gain or loss shall be taken into account for the taxable year),

(2) proper adjustment shall be made in the amount of any gain or loss subsequently realized for gain or loss taken into account by reason of paragraph (1),

(3) any gain or loss with respect to a section 1256 contract shall be treated as—

(A) short-term capital gain or loss, to the extent of 40 percent of such gain or loss, and

(B) long-term capital gain or loss, to the extent of 60 percent of such gain or loss

. . . . .

(b) **Section 1256 contract defined.**—For purposes of this section, the term "section 1256 contract" means—

(1) any regulated futures contract,

(2) any foreign currency contract,

(3) any nonequity option, and

(4) any dealer equity option.

(c) **Terminations, etc.**—

(1) **In general.**—The rules of paragraphs (1), (2), and (3) of subsection (a) shall also apply to the termination (or transfer) during the taxable year of the taxpayer's obligation (or rights) with respect to a section 1256 contract by offsetting, by taking or making delivery, by exercise or being exercised, by assignment or being assigned, by lapse, or otherwise.

. . . . .

(e) **Mark to market not to apply to hedging transactions.**—

(1) **Section not to apply.**—Subsection (a) shall not apply in the case of a hedging transaction.

26 U.S.C. § 1256 (1994).

■ Section 1256 instructs taxpayers on the correct method of income recognition when they sell or otherwise transfer regulated futures contracts. As the contracts donated by the taxpayers to the Institute are regulated futures contracts, they are governed by this provision. *See* § 1256(b). According to § 1256, a taxpayer's futures contracts are annually treated as if sold for fair market value on the final business day of the tax year. As every contract is "constructively sold" each year, a taxpayer must recognize accrued gains and losses annually by marking-to-market. *See* § 1256(a)(1). As noted earlier, this is a different accounting system than that used for the taxation of most other property. For example, even while taxpayers know the annual increases or decreases

in the value of common stock they hold on national exchanges, recognition of any capital gain or loss is delayed until the time of sale or exchange. The constructive recognition of accrued gain in § 1256 is an exception to the general rule set forth in the IRC. *Compare* 26 U.S.C. § 1256 *with* 26 U.S.C. § 1001.

Section 1256 also deems that 40 percent of the gain or loss is a short-term capital gain or loss and 60 percent a long-term capital gain or loss. *See* § 1256(a)(3). The statute takes into account the gain or loss constructively received during the previous year. This prevents double taxation or double deduction. In other words when a taxpayer's futures contract declines in value in Year 2 but increases in Year 3, the contract's value at the end of Year 2 serves as its basis when the taxpayer determines her liabilities in Year 3. In this fashion, a taxpayer claiming a deduction in Year 2 cannot deny liability in Year 3 by referring to her Year 1 basis. 26 U.S.C. § 1256(a)(2).

■ In § 1256(c)(1) this mark-to-market rule is applied to instances where taxpayers terminate or transfer their obligations or rights under a regulated futures contract. That is to say, the futures contract must not only be marked annually to market when a taxpayer retains the contract; it must also be marked-to-market when a taxpayer transfers the contract. Section 1256(c)(1) lists a variety of ways that a futures contract can be terminated or transferred: "[B]y offsetting, by taking or making delivery, by exercise or being exercised, by assignment or being assigned, by lapse, or otherwise." By their terms the mark-to-market rules appear to govern all terminations and transfers of futures contracts.

■ Taxpayers assert that the language in § 1256(c) does not govern the charitable donation of futures contracts because they are terminations outside the context of a regulated market. They note that many of the words used in the statute, such as "offsetting" and "taking or making delivery," are terms of art in the commodity markets. This may well be true, but the statute also uses words of broader application that appear to refer to all terminations or transfers. There

is no reason for excluding charitable donations from the definition of transfer. Indeed, the IRC's gift tax provisions categorize a gift as a "transfer" of property. *See* 26 U.S.C. § 2501(a)(1) (1994) (imposing tax on "transfer of property by gift"). When § 1256 lists several types of terminations and follows those with the words "or otherwise," the statute necessarily brings transfers of all kinds within its compass. The statute does not say "or other similar terminations," nor does it limit in any way the words "or otherwise." Consequently, the statute's plain language requires the taxpayers to mark their contracts to market and recognize any gain when they transfer a contract by donating it to the Institute.

The district court did not read the statute as just outlined, and instead effectively created an exception to the mark-to-market rules for charitable donations. We recognize that § 1256 does include an exception to the mark-to-market rules, but it does not involve the scenario in the case at hand. Rather, the statute explicitly exempts certain hedging transactions from the mark-to-market rules. 26 U.S.C. § 1256(e). Excepted hedging transactions are those a business commonly enters into not for the purpose of making a profit, but to reduce the risk inherent in some economic enterprises. *See* § 1256(e)(2). Because Congress considered this risk-reducing motivation to be unique, the statute does not require marking to market for specified hedging transactions.

■ The ancient maxim *expressio unius est exclusio alterius* (mention of one impliedly excludes others) cautions us against engrafting an additional exception to what is an already complex tax code. *See Water Transp. Ass'n v. Interstate Commerce Comm'n*, 722 F.2d 1025, 1028–29 (2d Cir. 1983) (rejecting an argument that act of Congress that only conferred standing in a limited class of cases should be read to allow standing in other cases); *see also United States v. Smith*, 499 U.S. 160, 167, 111 S.Ct. 1180, 1185, 113 L.Ed.2d 134 (1991) ("Where Congress explicitly enumerates certain exceptions . . . additional exceptions are not to be implied, in the absence of evidence of a contrary legislative intent."). Although the statute contemplates that a good reason exists not to apply the mark-to-market approach in hedging transactions, the charitable donation context does not fall within the rationale that brought about the statutory exception to the general mark-to-market rule, nor does the statute explicitly set forth an exception for donations to charity. Moreover, we should be especially reluctant to create an exception that would allow the capital gain to be excluded by the taxpayer. The Supreme Court has instructed that "an accession to wealth is not to be held excluded from income unless some provision of the Internal Revenue Code clearly so entails." *United States v. Burke*, 504 U.S. 229, 248, 112 S.Ct. 1867, 1878, 119 L.Ed.2d 34 (1992) (Souter, J., concurring).

■ Taxpayers next point to the general rule for recognition of gain or loss in 26 U.S.C. § 1001 and argue that it governs this case. Section 1001 provides that realized gain is determined by reference to the money and property received in exchange for the disposition of property. Taxpayers claim that because they receive no money or property in exchange for the disposition of their futures contracts, their donations cannot result in taxable gain. Section 1001 is the relevant tax provision governing recognition of gain or loss upon the transfer of most forms of property. Yet it does not control where § 1256 applies. When two statutes are in conflict, that statute which addresses the matter at issue in specific terms controls over a statute which addresses the issue in general terms, unless Congress has manifested a contrary aim. *See American Land Title Ass'n v. Clarke*, 968 F.2d 150, 157 (2d Cir.1992), *cert. denied*, 508 U.S. 971, 113 S.Ct. 2959, 125 L.Ed.2d 660 (1993). We therefore apply the recognition rules of § 1256, the statute that speaks directly to the transfer of regulated futures contracts, rather than the general language of § 1001. As a result, on the basis of the statute's language, no principled reason leads to a construction of § 1256 that would exempt donations to charity from the mark-to-market rule. The Greenes must therefore mark their futures contracts to market as of the dates the contracts are transferred to the

Institute and recognize as income their accrued long-term capital gains.

## B. *Legislative History*

■ Taxpayers further insist that Congress never intended the statute to apply to charitable donations. Although a statute's plain language is generally dispositive, it sometimes will yield when evidence of legislative history is so strong to the contrary that giving a literal reading to the statutory language will result in defeating Congress' purpose in enacting it. *See American Land Title Ass'n,* 968 F.2d at 155; *see also United States v. Ron Pair Enters.,* 489 U.S. 235, 242, 109 S.Ct. 1026, 1031, 103 L.Ed.2d 290 (1989) (urging departure from plain meaning when it would "produce a result demonstrably at odds with the intentions of its drafters."). Thus, a short review of this section's legislative history is appropriate.

■ Section 1256 was amended as part of the Economic Recovery Tax Act of 1981, Pub.L. No. 97-34, § 503(a) 95 Stat. 172, 327 (1981) (codified as amended at 26 U.S.C. § 1256 (1994)). The legislative history demonstrates that the statute was enacted in order to harmonize tax treatment of commodity futures contracts with the economic realities of the marketplace. In so doing, Congress hoped to "end th[e] use of futures for tax-avoidance purposes, establish an accurate method of determining a taxpayer's futures income (or loss), and ease tax administration and paperwork for both Government officials and taxpayers." S.Rep. No. 144, 97th Cong., 1st Sess. 156 (1981), *reprinted in* 1981 U.S.C.C.A.N. 105, 255 (Senate Report).

■ Before the enactment of § 1256, many taxpayers engaged in "commodity straddles," an abusive tax practice resulting from the nature of the commodities market. A "straddle" consists of establishing "matching" positions in two futures contracts—one contract to buy a commodity and one contract to sell the same commodity. When the market moved up or down—as it inevitably did—one leg of the transaction showed a gain, the other a loss. The taxpayer liquidated the losing leg, thereby claiming a capital loss, and continued to hold that portion of his contract with an unrealized gain. Hence,

the taxpayer suffered no economic loss and would, without economic risk, subsequently re-establish the straddle by purchasing another "matching" leg. During the following tax year, the taxpayer completely closed out his position; only then would he pay taxes on his capital gains. *Id.* at 254–55.

It was in this fashion that many taxpayers deferred capital gain taxes for one year and (in some cases) converted a short-term capital gain into a long-term capital gain. This arrangement was advantageous for taxpayers in two ways. First, where tax rates are constant, tax deferral is equivalent to imposing the tax initially but not taxing subsequent profit from the continued investment of what is left after payment of the tax. In other words, tax deferral provides the same benefits as tax-free investment income. William D. Andrews, *A Consumption–Type or Cash Flow Personal Income Tax,* 87 Harv. L.Rev. 1113, 1126 (1974). Second, a long-term capital gain is often treated more advantageously than a short-term capital gain. *Cf.* 26 U.S.C. §§ 1212(b), 1222 (showing different classification of long-term and short-term capital gains). *See generally* H.R. Conf. Rep. No. 841, 99th Cong., 2d Sess. II–105–II–106 (1986), *reprinted in* 1986 U.S.C.C.A.N. 4075, 4193–94.

Beyond this, the legislative history reveals that Congress also wanted commodity traders to pay their taxes according to the same schedule used in commodity markets. In the commodity markets a trader must deposit additional funds into her account when her position decreases in value. Analogously, when her position increases in value, she may at once withdraw money from her account. The legislative history explains that "[b]ecause a taxpayer who trades futures contracts receives profits as a matter of right or must pay losses in cash daily, the committee believes it appropriate to measure the taxpayer's futures' income on the same basis for tax purposes." Senate Report at 256.

The legislative history shows that Congress intended § 1256 to have broad application, inasmuch as it explains that "*[u]nless specifically excepted,* all regulated futures contracts are subject to the mark-to-market

rules." *Id.* at 257 (emphasis supplied). As the only specific exception included is the hedging exception, it would appear that § 1256 was directed at all other terminations or transfers, necessarily including the charitable donations at issue. The district court therefore erred in concluding that the legislative history of § 1256 provided no support for the proposition that the mark-to-market rules were aimed at altering the availability of a charitable deduction when futures contracts are donated to charity. *See Greene II,* 864 F.Supp. at 416. Resort to legislative history is of no help to taxpayers; instead, it lends support to the construction derived from a reading of the statute's plain language.

### C. *Tax Policy Considerations*

 Finally, taxpayers assert that § 1256 was not directed at the sort of charitable gift they made, but at abusive tax dodges obtained through the use of straddles. They point to considerations of tax policy involved in the case at bar. Of course, Congress is responsible for determining tax policy. Nonetheless, it is worth noting that today's decision is consistent with the tax policy advanced by Congress in § 1256.

In 1981, Congress sought to adopt the IRS position that when an investor in commodity futures "ha[s] no reasonable expectation of deriving an economic profit from the transaction[,]" she should be denied a deduction. Senate Report at 254. While there is no suggestion that the Greenes were motivated by an impermissible desire to circumvent the IRC, the rule adopted by the district court would permit potential abuses akin to those prohibited by § 1256. For example, a taxpayer could establish a commodity straddle similar to the one discussed earlier. Assume that over time one leg gained $10,000 while the other lost $10,000. In real economic terms the trader has neither a gain nor a loss. Under the rule laid out by the district court the trader could then donate the long-term capital gain of $6,000 to charity and claim a $6,000 charitable deduction. *See* 26 U.S.C. § 170. The taxpayer could not claim a $4,000 charitable deduction by donating the short-term capital gain; tax law prohibits

this. *See* 26 U.S.C. § 170(e)(1)(A). He would therefore elect to keep this $4,000 gain, which would be offset by a $4,000 short-term capital loss from the losing leg of the straddle. As the two cancel each other out, the taxpayer would pay no taxes on short-term gain. But when closing out his position by selling this contract, the taxpayer would also be entitled under the trial court's rule to claim a $6,000 long-term capital loss.

In short, a taxpayer could claim $12,000 in potential deductions—$6,000 as a charitable deduction and $6,000 for the long-term capital loss—while only incurring a real economic loss of $6,000. Such an outcome would subvert the tax policy behind the enactment of § 1256, which was to prevent investors from avoiding taxes by making futures investments which offered no chance of economic gain or loss. *See* Senate Report at 254–55. Our view of § 1256 would instead require a taxpayer to mark his $6,000 gain to market and recognize it as income before the contract is donated to charity. This way, the $6,000 loss and the $6,000 gain claimed as a result of market shifts would cancel each other out, leaving the taxpayer only with the $6,000 charitable deduction. Such a construction of the statute gives proper recognition to the economic reality of the transaction.

The district court correctly observed that "[t]axpayers are able to donate other types of property to charity without realizing capital gains as income." *Greene II,* 864 F.Supp. at 416. However, Congress has created a rule that treats futures contracts differently in a variety of contexts, one of which happens to be charitable donations. Should Congress wish to allow donors of futures contracts to engage in the practice described above—to claim $12,000 in deductions when they have actually lost only $6,000—it need only add a specific exception to § 1256, as it did in the hedging context. Without such a provision, we think it an inappropriate arrogation of legislative power for a court to amend the statute under the guise of judicial construction.

### CONCLUSION

Accordingly, we remand this case to the district court with directions that it apply

§ 1256 in proceedings consistent with this opinion. Plaintiffs must mark their futures contracts to market at the time of termination or transfer—here, the time of donation to charity—and recognize any economic gain. As the Greenes have already paid the IRS in full for the tax years 1983–1987, their claim to a refund should be denied to the extent necessary to reflect the proper application of § 1256.

The judgment appealed from is affirmed in part, reversed in part, and remanded for further proceedings not inconsistent with this opinion.