**Leonard GREENE and Joyce Greene, Plaintiffs–Appellants,**

v.

**UNITED STATES of America, Defendant–Appellee.**

**Docket No. 98–6038.**

United States Court of Appeals, Second Circuit.

Argued Feb. 8, 1999.

Decided July 23, 1999.

Sheldon H. Elsen, New York, New York (Melissa Cohen, Orans, Elsen & Lupert LLP, New York, New York; Richard A. Sporn, Gerald & Lawrence Blumberg LLP, New York, New York, of counsel), for Plaintiffs–Appellants.

Robert W. Sadowski, Assistant United States Attorney, New York, New York (Mary Jo White, United States Attorney, Kay K. Gardiner, Assistant United States Attorney, Southern District of New York, New York, New York, of counsel), for Defendant–Appellee.

Before: WINTER, Chief Judge, CARDAMONE and PARKER, Circuit Judges.

CARDAMONE, Circuit Judge.

Plaintiffs Leonard and Joyce Greene (taxpayers or appellants) appeal the judgment entered on January 23, 1998 in the United States District Court for the Southern District of New York (Barrington D. Parker, J.), holding them liable to the United States of America for taxable gains recognized under the mark-to-market rules of 26 U.S.C. § 1256 (1994). This liability was incurred by the Greenes at the time when they made a donation of futures contracts to charity. The Greenes concede that the mark-to-market rules of § 1256(a)(1) require the recognition of gains in the fair market value of the futures contracts at the end of every tax year and at the time of donation to charity. But, they assert, the adjustment provision

in § 1256(a)(2) eliminates the need to recognize the gains that are marked to market (and thus constructively realized), but not *actually* received by taxpayers at the time of transfer of their futures contracts to charity.

The Greenes' reading of § 1256 is bottomed on an incorrect assumption that the statute operates on the "cash basis" method of accounting—a method that recognizes gains and losses in the value of property only as realized in discrete transactions—rather than on the "accrual" method of accounting, which tracks changes in the market value of property independent of the timing of their disposition. The system of taxation on personal income in this country operates for the most part on a cash basis, so that tax consequences only occur when property is sold and money is received for it. *See* 26 U.S.C. § 1001 (1994). This basis of accounting applies nearly across the board to all property, including real estate and securities. One exception to the cash basis method is regulated futures contracts. For that sort of property, accrual accounting, which will be fully discussed later in this opinion, is used.

Taxpayers' confusion is not too surprising given the divergence of the accrual method used in § 1256 from the commonly applicable cash basis method. This divergence is so out of the ordinary that, upon an initial reading of § 1256, a person might feel like Dorothy did upon finding herself transported to the Land of Oz, and, speaking to her dog, said: "Toto, I've a feeling we're not in Kansas anymore."[1] But, while there may be no place like home for Dorothy, or a cash basis for the Greenes, the text of the statute, the legislative history, and considerations of tax policy prevent us from adopting taxpayers' alternative reading of § 1256. Their arguments therefore do not carry the day. Instead, we affirm the judgment of the district court.

## BACKGROUND

This is the third time the Greenes have been before us in connection with the federal tax treatment of their donation of futures contracts to charity. Accordingly, we assume familiarity with the relevant facts as set out in prior opinions. *See Greene v. United States,* 13 F.3d 577, 579–80 (2d Cir.1994) (*Greene I* ); *Greene v. United States,* 79 F.3d 1348, 1350–51 (2d Cir.) (*Greene II* ), *cert. denied,* 519 U.S. 1028, 117 S.Ct. 582, 136 L.Ed.2d 512 (1996); *Greene v. United States,* 975 F.Supp. 273, 274 (S.D.N.Y.1997) (*Greene III* ).

The controversy concerns the Greenes' donation, during tax years 1982 to 1987, of the long-term capital gain portion of certain futures contracts they owned to the Institute for Socioeconomic Studies, Inc. (Institute), a non-profit, tax-exempt private foundation. *See Greene I,* 13 F.3d at 579–80. In 1990 the Internal Revenue Service (IRS) sent taxpayers, a married couple, a Notice of Deficiency for 1982 that sought to include the total accrued gains in the fair market value of the futures contracts in their 1982 taxable income, as well as to disallow certain carryforward charitable deductions arising from the donation of those contracts. After paying the deficiency, the Greenes filed a claim for refund with the IRS, which was disallowed.

In May 1991 they instituted suit in federal district court, and obtained a grant of summary judgment in their favor. *See id.* at 580. On appeal, we held that neither the anticipatory assignment of income doctrine, nor the step transaction doctrine required taxpayers to include these gains in their taxable income. At the same time, we declined to address a third argument the government made—based on 26 U.S.C. § 1256—which it had failed to raise in the district court. We therefore affirmed the judgment of the district court, holding that

---

**1.** This line from the movie *The Wizard of Oz* (Metro–Goldwyn–Mayer 1939) was based on L. Frank Baum, *The Wonderful Wizard of Oz* (Justin Knowles Publishing 1987) (1899).

taxpayers were entitled to a refund for the 1982 tax year. *See id.* at 581–86.

While the above litigation was pending, the IRS issued a Notice of Deficiency in March 1992 for tax years 1983 through 1987, seeking this time to include the long-term capital gain portion of the donated futures contracts in the Greenes' taxable income for those years, as well as to impose certain tax penalties. *See Greene II,* 79 F.3d at 1351. Again, the IRS disallowed taxpayers' claim for refund, and again the district court granted summary judgment in the Greenes' favor. *See id.*

This time on appeal, we reversed. First, we found our decision in *Greene I* did not collaterally estop the government from raising its argument based on § 1256 with respect to these different and later tax years. *See id.* at 1351–53. Second, we held that § 1256 required taxpayers to mark the futures contracts to market and to recognize accrued gains in the contracts' fair market value at the time of termination or transfer, in this instance a donation to charity. *See id.* at 1355, 1358. Accordingly, we remanded the case with directions that the district court "apply § 1256 in proceedings consistent with this opinion. Plaintiffs must mark their futures contracts to market at the time of termination or transfer—here, the time of donation to charity—and recognize any economic gain." *Id.* at 1357–58.

On remand, the Greenes contended before the district court that our opinion in *Greene II* had neglected to decide precisely how to calculate the amount of economic gain realized at the time of donation to charity. Although taxpayers conceded that *Greene II* required application of the mark-to-market rules of § 1256(a)(1), they argued that § 1256(a)(2) also required a "proper adjustment . . . in the amount of any gain . . . subsequently realized. . . ." Specifically, taxpayers asserted that because they received no actual gains either at the time of the charitable transfer or at the time of the Institute's subsequent liquidation of the contracts, the "proper adjust-ment" required by § 1256(a)(2) should have entailed a reduction of their taxable gains to zero. *See Greene III,* 975 F.Supp. at 275.

In an opinion dated August 28, 1997, the district court rejected taxpayers' view of the tax law, reasoning that the sole purpose of the "proper adjustment" provision was to prevent duplicative taxation of gains (as well as duplicative deduction of losses) already recognized from marking to market in prior tax years. *See id.* at 276. Judgment was entered on January 23, 1998, and this appeal ensued.

## DISCUSSION

### Interpretation of § 1256

#### A. *Statutory Language*

As before, we construe 26 U.S.C. § 1256 by looking first to its plain language. *See Greene II,* 79 F.3d at 1353 (citing *Rubin v. United States,* 449 U.S. 424, 430, 101 S.Ct. 698, 66 L.Ed.2d 633 (1981)). The statute is titled "Section 1256 contracts marked to market" and reads, in pertinent part, as follows:

(a) **General rule**

For purposes of this subtitle—

(1) each section 1256 contract held by the taxpayer at the close of the taxable year shall be treated as sold for its fair market value on the last business day of such taxable year (and any gain or loss shall be taken into account for the taxable year),

(2) proper adjustment shall be made in the amount of any gain or loss subsequently realized for gain or loss taken into account by reason of paragraph (1),

.    .    .    .    .

(b) **Section 1256 contract defined**

For purposes of this section, the term "section 1256 contract" means—

(1) any regulated futures contract,

.    .    .    .    .

### (c) Terminations, etc.

#### (1) In general

The rules of paragraphs (1), (2), and (3) of subsection (a) shall also apply to the termination (or transfer) during the taxable year of the taxpayer's obligation (or rights) with respect to a section 1256 contract. . . .

. . . . .

#### (3) Fair market value taken into account

For purposes of this subsection, fair market value at the time of the termination (or transfer) shall be taken into account.

. . . . .

### (e) Mark to market not to apply to hedging transactions

#### (1) Section not to apply

Subsection (a) shall not apply in the case of a hedging transaction.

26 U.S.C. § 1256 (1994).

In *Greene II,* we ruled that the futures contracts donated by the Greenes fell within the definition of "section 1256 contract" in § 1256(b)(1), and that the donation of these contracts to charity constituted a "transfer" within the meaning of § 1256(c)(1). 79 F.3d at 1354–55. Hence, we held that § 1256(a)(1) required the Greenes to mark the contracts to market and to recognize any gain in the fair market value of the contracts at the time when they made the donation to charity. *See id.* at 1355. We explained how § 1256(a)(2) works in this context as follows:

The statute takes into account the gain or loss constructively received during the previous year. This prevents double taxation or double deduction. In other words when a taxpayer's futures contract declines in value in Year 2 but increases in Year 3, the contract's value at the end of Year 2 serves as its basis when the taxpayer determines her liabilities in Year 3. In this fashion, a taxpayer claiming a deduction in Year 2 cannot deny liability in Year 3 by referring to her Year 1 basis. 26 U.S.C. § 1256(a)(2).

*Id.* at 1354.

On their present appeal, the Greenes contend § 1256(a)(2) is not limited to the function of preventing double taxation or double deduction. Rather, they maintain, "the amount of any gain or loss [they] subsequently realized" from their charitable donation was zero, with all gains instead realized by the charity when the contracts were eventually liquidated. Taxpayers' reasoning concludes that § 1256(a)(2) entitled them to a "proper adjustment" to zero "for gain or loss taken into account by" the mark-to-market rules of § 1256(a)(1). They declare that any other interpretation would render § 1256(a)(2) inapplicable to charitable transfers, contrary to the explicit direction of § 1256(c)(1). In addition, they insist this reading is mandated by the definition of "gain" in 26 U.S.C. § 1001(a) and of "amount realized" in § 1001(b), and that to construe § 1256 otherwise would counter the general rule that charitable transfers do not constitute realization events under § 1001(b).

■ Although taxpayers' reading of § 1256(a)(2) appears plausible at first blush, it founders for much the same reasons we elaborated in *Greene II.* There, we first explained that in light of the broad language of § 1256, Congress' choice to carve out a single exception for hedging transactions, *see* § 1256(e)—while declining to create a similar exception for charitable transfers—counseled against judicially engrafting such an exception to the general rule in § 1256(a)(1) that accrued gains be recognized at the time of transfer. *See* 79 F.3d at 1355 (citing the "ancient maxim *expressio unius est exclusio alterius* (mention of one impliedly excludes others)"). Second, we expressly rejected the argument that the general rule in § 1001 for recognition of taxable gain should govern this case. We reasoned that where two statutes conflict, the more specific provision of the two controls, absent a con-

trary directive from Congress. *See id.* ("We therefore apply the recognition rules of § 1256, the statute that speaks directly to the transfer of regulated futures contracts, rather than the general language of § 1001."); *see also id.* at 1354 ("The constructive recognition of accrued gain in § 1256 is an exception to the general rule set forth in the IRC. *Compare* 26 U.S.C. § 1256 *with* 26 U.S.C. § 1001."). In particular, this means that an amount may be "realized" within the meaning of § 1256(a)(2) even if it would not constitute an "amount realized" under § 1001(b). *Compare* 26 U.S.C. § 1256(a)(2) (referring to "amount of any gain or loss subsequently realized") *with* 26 U.S.C. § 1001(b) (defining "amount realized" as money, or money-substitutes, "received").

Moreover, the Greenes need not fear that rejecting their reading of § 1256(a)(2) will render that provision inapplicable to charitable transfers. At the time of transfer, § 1256(a)(2) protects the transferor against double taxation (and the IRS against double deduction) with respect to gains (and losses) that already were recognized by the transferor in prior tax years under the mark-to-market rules of § 1256(a)(1). The amount of taxable gain or deductible loss recognized by the transferor at the time of the charitable transfer will therefore equal the difference between the fair market value of the futures contracts at the time of such transfer, *see* § 1256(c)(3), and the transferor's tax basis in the futures contracts, as adjusted under § 1256(a)(2) to account for gains and losses already recognized in prior tax years under the mark-to-market rules. Obviously, once the transfer has taken place, the transferor has terminated his interest in the property and will not recognize any further tax consequences from the transferee's subsequent disposition of the property.

Contrary to appellants' argument, this result satisfies the plain language of § 1256(a)(2). The transfer to charity creates an "amount ... subsequently real-

ized" within the meaning of § 1256(a)(2) because it is "subsequent[ ]" to all previous marks-to-market mandated by § 1256(a)(1). The fact that the taxpayer never receives the sum does not change the fact that it is "realized," because, as noted, the general definition of "amount realized" contained in § 1001(b) does not apply here. Once the gain or loss is realized, the statute requires that it be "proper[ly] adjust[ed]." "[P]roper adjustment" is achieved when the gains and losses previously "taken into account by reason of paragraph (1)"—that is, the gains and losses from all previous marks-to-market—are either subtracted from or added to the amount realized at the time of the transfer to charity.

## B. *Legislative History*

The rationale underlying our reading of 26 U.S.C. § 1256 becomes clearer still when viewed in the context of the statute's legislative history. *See Greene II,* 79 F.3d at 1356–57 (citing *United States v. Ron Pair Enters.,* 489 U.S. 235, 242–43, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989)).

As we explained in *Greene II,* the "legislative history [of § 1256] demonstrates that the statute was enacted in order to harmonize tax treatment of commodity futures contracts with the economic realities of the marketplace." 79 F.3d at 1356. Specifically, Congress enacted § 1256 to combat the abusive tax practice of engaging in "commodity straddles" that artificially deferred the recognition of capital gains in those cases where the value of taxpayers' futures contracts had appreciated. *See id.* We went on to explain:

> Beyond [the prevention of abusive straddles], the legislative history reveals that Congress also wanted commodity traders to pay their taxes according to the same schedule used in commodity markets. In the commodity markets a trader must deposit additional funds into her account when her position decreases in value. Analogously, when her position increases in value, she may at once

withdraw money from her account. The legislative history explains that "[b]ecause a taxpayer who trades futures contracts receives profits as a matter of right or must pay losses in cash daily, the committee believes it appropriate to measure the taxpayer's futures' income on the same basis for tax purposes." *Id.* (quoting S.Rep. No. 97–144, at 157 (1981), *reprinted in* 1981 U.S.C.C.A.N. 105, 256); *see also Helvering v. Horst,* 311 U.S. 112, 118, 61 S.Ct. 144, 85 L.Ed. 75 (1940) ("The power to dispose of income is the equivalent of ownership of it. The exercise of that power to procure the payment of income to another is the enjoyment, and hence the realization, of the income by him who exercises it."); *Murphy v. United States,* 992 F.2d 929, 931 (9th Cir.1993) (finding § 1256 constitutional on this rationale).

■■■ It is for this reason that § 1256 departs from the "cash basis" method of accounting that generally governs the personal income taxation system, *see* 26 U.S.C. § 1001; under that method, the recognition of gains or losses resulting from fluctuations in the fair market value of property is deferred until the property is exchanged for value in a transaction. *See Greene II,* 79 F.3d at 1350; *see also* Marvin A. Chirelstein, *Federal Income Taxation: A Guide to the Leading Cases and Concepts* § 11, at 232–33 (7th ed.1994) (explaining that cash basis method follows timing of transactions). Instead, § 1256 adopts the "accrual" method of accounting, which "determines taxable income by making reference to changes in the actual market value of a taxpayer's futures contracts even when the taxpayer has not yet sold or exchanged the contracts or otherwise realized a gain or a loss." *Greene II,* 79 F.3d at 1350; *see also* Chirelstein, *Federal Income Taxation* § 12, at 241 (explaining that accrual method follows fixed changes in economic obligations independent of timing of transactions).

■■■ In this context, § 1256(a)(2) functions not to ensure that appreciated gains are recognized only to the extent of the value *presently* received in a given transaction, as might be appropriate under the cash basis method, but rather to prevent the duplicative recognition of gains or losses that might arise were *prior* gains or losses not accounted for under the accrual method of accounting. Indeed, the legislative history confirms that § 1256(a)(2) adopts such a retrospective approach when it explains: "If a taxpayer holds futures contracts at the beginning of a taxable year, any gain or loss subsequently realized on these contracts must be adjusted to reflect any gain or loss taken into account with respect to these contracts in a *prior* year." S.Rep. No. 97–144, at 157 (emphasis added), *reprinted in* 1981 U.S.C.C.A.N. at 256.

Although appreciated gains need not be recognized when other types of appreciated property are donated to charity, such gains are recognized under § 1256 for charitable donations of futures contracts. This disparity is a consequence of Congress' choice to depart from the cash basis method generally applicable to other forms of property, and instead to assess futures contracts under the accrual method of accounting, as a means of better reflecting the economic realities of the commodities market. *See Greene II,* 79 F.3d at 1356–57 (explaining based on legislative history that § 1256 was meant to apply broadly to all futures contracts " '[u]nless specifically excepted,' " *i.e.,* unless within hedging exception of § 1256(e) (quoting S.Rep. No. 97–144, at 158, *reprinted in* 1981 U.S.C.C.A.N. at 257)).

## C. *Tax Policy Considerations*

As we explained in detail in *Greene II,* tax policy considerations also support our reading of § 1256, insofar as a contrary result would permit a taxpayer to enter into commodities straddles with the effect of producing artificial losses. 79 F.3d at 1357. In other words, without recognition of gain under § 1256(a)(1), a taxpayer could enter into offsetting commodities po-

**74**

sitions and wait for gain to accrue with respect to one position (the gaining leg) and loss to accrue with respect to the other (the losing leg); the taxpayer could then donate the long-term gain on the gaining leg to charity and claim a charitable deduction, and liquidate the losing leg and claim a further deduction for the resulting loss, all without any expectation of deriving an economic profit. *See id.* Under § 1256, however, a taxpayer must recognize taxable gain on the gaining leg at the time of donation to charity, thus canceling out the loss from the losing leg and leaving the taxpayer with only the charitable deduction. *See id.*

Appellants argue that in *Greene II* we erroneously found that the straddle could be used to obtain unwarranted tax benefits. Specifically, appellants argue that we erred by finding that the "real economic loss" incurred in the hypothetical situation discussed therein was $6,000. *See Greene II,* 79 F.3d at 1357 (analyzing hypothetical commodities straddle where taxpayer donated $6,000 long term gain on gaining leg and liquidated losing leg with $6,000 long term loss). Appellants contend that the real economic loss in the hypothetical situation is in fact $12,000, and thus, that employing § 1256 to set the deductible loss at $6,000 ignores the economic reality of the transaction. Specifically, appellants argue that they are out-of-pocket $12,000 because they have donated $6,000 to charity while seeing the equity in their commodities account reduced by the same $6,000. But permitting an adjustment under § 1256(a)(2) because of this fact would make no more sense than would permitting an additional loss, above and beyond the charitable deduction, for any taxpayer who makes a charitable donation from any other type of account (*e.g.,* a taxpayer who writes a check to charity, reducing the balance in her checking account). Taxpayers' contrary view of § 1256 is not therefore one that we can adopt.

## CONCLUSION

Accordingly, and for the reasons stated, we affirm the judgment of the district court.